#### IN THE UNITED STATES DISTRICT COURT
#### DISTRICT OF SOUTH CAROLINA
#### CHARLESTON DIVISION

| | |
|---|---|
| MUSC Health Cancer Care Organization, LLC, a Delaware Limited Liability Company,<br><br>    Plaintiff,<br><br>v.<br><br>The Medical University Hospital Authority, a state authority of the State of South Carolina,<br><br>    Defendant. | Civil Action No. 2:22-cv-3066-RMG<br><br><br>**ORDER AND OPINION** |

Before the Court is Defendant's motion to dismiss (Dkt. No. 12). For the reasons set forth below, the Court dismisses this action without prejudice.

**I. Background**

Plaintiff provides market focused radiation therapy solutions to healthcare facilities and other types of healthcare providers. In February 2014, Plaintiff entered into an Oncology Service Agreement (the "Contract") with Defendant the Medical University Hospital Authority ("MUHA" or the "authority") to provide radiation therapy services, equipment, space, personnel, and supplies to patients at specified locations in Charleston, South Carolina, and surrounding areas. (Dkt. No. 1 at 1). Plaintiff alleges that MUHA is in breach of the Contract and that MUHA's conduct is "a pretextual attempt to oust" Plaintiff from the parties' "longstanding contractual relationships so that [MUHA] can improperly assume all of [Plaintiff's] functions under the [Contract] . . . for [its] sole and exclusive monetary benefit." (*Id.* at 2). Plaintiff brings claims for (1) Breach of Contract; (2) Declaratory Judgment under 15 S.C. Code Ann. § 15-53-10, *et seq.*; and (3) Unjust Enrichment/Quantum Meruit.

1

MUHA moves to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(1), 12(b)(2), and 12(b)(6). (Dkt. No. 13). Plaintiff filed a response in opposition, (Dkt. No. 15), and MUHA filed a reply, (Dkt. No. 19).

On March 1, 2023, the Court held oral arguments on MUHA's motion.

MUHA's motion is fully briefed and ripe for disposition.

## II.     Legal Standards

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) examines whether the court lacks subject matter jurisdiction. Generally, the burden of proving subject-matter jurisdiction is on the plaintiff, the party asserting jurisdiction. *See Richmond, Fredericksburg & Potomac R.R. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991). However, where a party challenges the subject-matter jurisdiction of the court on the grounds that the party is an arm of the state entitled to sovereign immunity, the burden of persuasion lies with the party asserting the immunity. *See Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ.*, 466 F.3d 232, 237 (2d Cir. 2006) (noting that the majority of federal circuit courts are in agreement with this allocation of the burden of proof on the issue of sovereign immunity). In evaluating a defendant's challenge to subject matter jurisdiction, the court is to "regard the pleadings' allegations as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Richmond, Fredericksburg & Potomac R.R.*, 945 F.2d at 768. The court should grant the motion "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999) (internal quotation marks and citations omitted

A Rule 12(b)(6) motion for failure to state a claim upon which relief can be granted "challenges the legal sufficiency of a complaint." *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009) (citations omitted); *see also Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) ("A motion to dismiss under Rule 12(b)(6) ... does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses."). To be legally sufficient a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A Rule 12(b)(6) motion should not be granted unless it appears certain that the plaintiff can prove no set of facts that would support her claim and would entitle her to relief. *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). When considering a Rule 12(b)(6) motion, the court should accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the plaintiff. *Ostrzenski v. Seigel*, 177 F.3d 245, 251 (4th Cir. 1999); *Mylan Labs., Inc.*, 7 F.3d at 1134. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.

### III. Discussion

#### a. Eleventh Amendment Immunity — Generally

Even though the language of the Eleventh Amendment preserves sovereign immunity of only the *States* of the Union,[1] it is settled that this protection extends also to "state agents and state

---

[1] The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against *one of the*

3

instrumentalities," *Regents of the University of California v. Doe,* 519 U.S. 425, 429 (1997) or stated otherwise, to "arm[s] of the State" and State officials, *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 280 (1977). But Eleventh Amendment immunity "does not extend to counties and similar municipal corporations." *Id.* This is so, even if the counties and municipalities exercise a "slice of State power." *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency,* 440 U.S. 391, 401 (1979).

The issue before this Court, as articulated by the Supreme Court, therefore turns on whether MUHA "is to be treated as an arm of the State partaking of the State's Eleventh Amendment immunity, or is instead to be treated as a municipal corporation or other political subdivision to which the Eleventh Amendment does not extend." *Mt. Healthy,* 429 U.S. at 280. Stated otherwise, this Court must determine whether MUHA "has the same kind of independent status as a county or is instead an arm of the State, and therefore 'one of the United States' within the meaning of the Eleventh Amendment." *Regents,* 519 U.S. at 429 n. 5.

Before elucidating the factors necessary to resolve this question, it is worthwhile to recognize that the immunity in question derives from the original sovereignty of the states and not from the Eleventh Amendment. "The Eleventh Amendment confirmed, rather than established, sovereign immunity as a constitutional principle." *Alden v. Maine,* 527 U.S. 706, 728–29 (1999). And, "it follows that the scope of the States' immunity from suit is demarcated not by the text of the Amendment alone but by fundamental postulates implicit in the constitutional design." *Id.* at 729. That design reserves to States "a substantial portion of the Nation's primary sovereignty, together with the dignity and essential attributes inhering in that status," *id.* at 714, and preserves

---

*United States* by Citizens of another State, or by Citizens or Subjects of any Foreign State." (Emphasis added).

"a system in which the State and Federal Governments would exercise concurrent authority over the people," *id.* (quoting *Printz v. United States,* 521 U.S. 898, 919–20 (1997)). The States thus "retain the dignity, though not the full authority, of sovereignty." *Id.* at 715. Central to the dignity of a State's sovereignty is the proposition that the State not be amenable to suit without its consent. At the time the federal Constitution was proposed, the fear expressed during the debates was that adoption of the new Constitution would strip States of their sovereign immunity, thereby exposing them to lawsuits for collection of Revolutionary War debts. *Id.* at 716–17.

"Even with a clear understanding of the source and nature of a State's sovereign immunity, no bright line of demarcation can be drawn separating 'state agents and state instrumentalities,' which partake of the State's Eleventh Amendment immunity, from local governmental entities, which do not." *Cash v. Granville Cnty. Bd. of Educ.*, 242 F.3d 219, 223 (4th Cir. 2001). But when the factors for resolving whether a governmental entity is an arm of the State or more like a county or municipality point in different directions, the inquiry seeks guidance in the "twin reasons" for the Eleventh Amendment: (1) "the States' fears that 'federal courts would force them to pay their Revolutionary War debts, leading to their financial ruin,'" and (2) "the integrity retained by each State in our federal system," including the States' sovereign immunity from suit. *Id.* (citing *Hess v. Port Auth. Trans-Hudson Corp.,* 513 U.S. 30, 39 (1994) (quoting *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 151 (1984))). Indeed, these twin reasons must "dominate" any analysis of whether a governmental entity is to be accorded Eleventh Amendment immunity. *Id.* (citing *Gray v. Laws,* 51 F.3d 426, 432 (4th Cir.1995)).

Courts evaluate four non-exclusive factors when considering whether a state-created entity functions as an arm of its creating state:

5

> 1) whether any judgment against the entity as defendant will be paid by the State [];
>
> (2) the degree of autonomy exercised by the entity, including such circumstances as who appoints the entity's directors or officers, who funds the entity, and whether the State retains a veto over the entity's actions;
>
> (3) whether the entity is involved with state concerns as distinct from non-state concerns, including local concerns; and
>
> (4) how the entity is treated under state law, such as whether the entity's relationship with the State is sufficiently close to make the entity an arm of the State.

*U.S. ex rel. Oberg v. Pennsylvania Higher Educ. Assistance Agency*, 804 F.3d 646, 651 (4th Cir. 2015) ("*Oberg*"); *Ram Ditta v. Maryland National Capital Park and Planning Commission*, 822 F.2d 456 (4th Cir. 1987) (articulating said factors, factors which the Court herein refers to as the "*Ram Ditta*" factors). District Courts must explicitly perform this analysis before making a ruling on an Eleventh Amendment immunity defense. *Cash*, 242 F.3d at 581.

      **b.**     **MUHA Waived Sovereign Immunity Regarding Plaintiff's Claims.**

The Contract provides that in the event of a material breach, either party may "exercise any right or remedy which may be available to it under this Agreement . . . or any applicable law" and "proceed by appropriate court action, to enforce the terms therefore or to recover damages for the breach hereof" or "pursue any other remedy at law or in equity." (Dkt. No. 24-1 ¶ 13) (filed under seal). The Contract is governed by South Carolina law. (*Id.* ¶ 30). Both parties waive their right to a jury trial. (*Id.* ¶ 27).

In its briefing, MUHA at times appears to argue that it is entitled to sovereign immunity such that Plaintiff cannot sue it in state or federal court for the breaches alleged in its complaint. *See* (Dkt. No. 13-1 at 11-13). MUHA also explicitly argues that Plaintiff's unjust enrichment claim is barred because South Carolina has not waived sovereign immunity for equitable claims. (*Id.* at 25-29).

At oral argument, MUHA agreed with the Court that it had waived sovereign immunity as to the Contract but disagreed with the Court that it had waived sovereign immunity as to Plaintiff's equitable claims.

The Court finds that MUHA has waived its sovereign immunity as to Plaintiff's contract and equitable claims. The plain language of the Contract shows MUHA contracted away its immunity on both counts. (Dkt. No. 24-1 ¶ 13) (providing that in the event of a material breach, either party may "exercise any right or remedy which may be available to it under this Agreement . . . or any applicable law" and "proceed by appropriate court action, to enforce the terms therefore or to recover damages for the breach hereof" or "pursue any other remedy *at law or in equity*") (emphasis added). In *Southern Power Company v. Cleveland County*, 24 F.4th 258, 264 (4th Cir. 2022) (applying North Carolina law), the Fourth Circuit held that a state waives sovereign immunity "when it 'enters into a *valid* contract.'" 24 F.4th at 264 (citing *Smith v. State*, 289 N.C. 303, 319 (1976) (collecting cases)); *Smith*, 289 N.C. at 319-20 (noting that "when the State enters into a validly authorized contract, it lays aside whatever privilege of sovereign immunity it otherwise possesses and binds itself to performance, just as any private citizen would do so by contract"). Here, neither party contends the Contract is invalid and MUHA does not dispute entering the Contract. Accordingly, MUHA has waived sovereign immunity as to Plaintiff's claims and the Court denies MUHA's motion on this point.

  b.  **MUHA is An Arm of the State of South Carolina and Not Amenable to Suit in Federal Court.**

The pertinent question for the Court therefore is whether, under the case law described above, MUHA is an arm of the State of South Carolina (the "State") immune from suit in federal court under the Eleventh Amendment.[2]

Originally a private institution, the Medical University of South Carolina ("MUSC") became a public medical school in 1913. *See* S.C. Code Ann. § 59-123-20; *Med. Soc. of S.C. v. Med. Univ. of S.C.*, 334 S.C. 270, 280 (1999) (identifying MUSC as a state agency). As is common of medical schools, MUSC also owned and operated hospitals and clinics. (Dkt. No. 13-1 at 6).

In 2000, the State created Defendant MUHA. (Dkt. No. 13-1 at 6); S.C. Code Ann. § 59-123-60(E). MUHA is defined as an "agency of the State of South Carolina" and operates the Medical University hospitals, clinics, and other health care and related facilities (referred to herein and in § 60 as the "hospital") formerly operated by MUSC. § 60(E).  Although MUSC continues to operate the medical school, MUHA is required to provide to MUSC "the services necessary for the training and education of health professionals," *id.* § 60(H), and must "continue to operate the hospital as a health provider for the citizens of South Carolina and the clinical site for the education and training programs of the Medical University of South Carolina." *id.* § 60(I). MUHA governs the hospital. *Id.* § 60(E).

The Board of Trustees of MUSC serves as the Board of Trustees for MUHA. *Id.* § 60(E) ("Whenever the board functions in its capacity as the governing body of the hospital, the board of trustees is constituted and designated as the Medical University Hospital Authority, an agency of

---

[2] In their respective briefing, both sides sometimes rely on cases which the Court finds of little persuasive value.  Plaintiff relies on a vacated district court opinion from the Middle District of Tennessee to support its position, *see* (Dkt. No. 15 at 13-14), while MUHA cites cases brought by and decided against pro se litigants or otherwise devoid of the explicit analysis the Fourth Circuit requires courts undertake to determine if an entity is an arm of the state, *see* (Dkt. No. 13-1 at 9-11).  Accordingly, the Court analyzes and applies the binding—and far more persuasive—Supreme Court and Fourth Circuit precedent cited herein.

8

the State of South Carolina."). Put differently, MUSC and MUHA share interlocking directors. DIRECTOR, Black's Law Dictionary (11th ed. 2019) (defining "interlocking director" as "[a] director who simultaneously serves on the boards of two or more corporations that deal with each other or have allied interests"). MUHA's board members are subject to "state ethics and accountability provisions of law." § 60(D).

MUHA's Board of Trustees consists of the Governor or his designee, *ex officio*, fourteen members elected by the General Assembly in joint assembly and one member appointed by the Governor. § 59-123-40. Members of the board or other officers of MUHA or its affiliates found guilty of various types of misconduct "shall be subject to removal by the Governor" at his or her discretion. § 60(H). MUHA is also subject to the Freedom of Information Act. *Id.* § 60(B)(C); S.C. Code Ann. § 30-4-10 *et seq.* (subjecting "public bodies" to South Carolina's Freedom of Information Act).

MUHA makes bylaws for the management, regulation, and operation of the hospital. § 60(E)(2). MUHA is responsible for constructing, operating, and maintaining the hospital and related premises, buildings and facilitates, and infrastructures. *Id.* § 60(E)(5). MUHA "shall adopt a written policy for the expenditure of public funds" and MUHA may expend public funds for "events which recognize academic and research excellence and noteworthy accomplishments of members of the faculty [of MUSC] and staff, students, and distinguished guests of the authority." *Id.* § 60(J).

MUHA possesses the capacity to contract. *Id.* § 60(E)(3)(a). While these contracts are exempt from the South Carolina Consolidated Procurement Code and Regulations, MUHA "must adopt a procurement policy requiring competitive bidding for constructions contracts, which must be filed and approved by the State Fiscal Accountability Authority." *Id.* MUHA can also dispose

of "any real property subject to the authority and approval of the State Fiscal Accountability Authority or the Department of Administration, as appropriate." *Id.* § 60(E)(3)(b). MUHA must remit the proceeds derived from the lease or sale of any real property "to the MUSC Board of Trustees to be used exclusively for the support of the Medical University." *Id.*

MUHA also has the authority to issue bonds. *Id.* § 60(E)(c). These bonds are not guaranteed by the State. *Id.* (providing any "guarantee or indebtedness of the authority shall not create an obligation of the State, nor shall such guarantee or indebtedness be considered a debt against the general revenue of the State"). MUHA's issuance of bonds however, is "subject to the approval . . . by resolution of the State Fiscal Accountability Authority." *Id.* § 60(E)(d).

The "policies of MUHA's personnel and employees are exempt from the Department of Administration personnel policies and applicable laws" and exempt from the State Employee Grievance Procedure. Nevertheless, MUHA is required to adopt "a grievance procedure substantially similar to the provisions of that article to govern personnel and employees of the authority." *Id.* § 60(E)(6).

MUHA employees are deemed "state employees" for the purpose of participating in the South Carolina Retirement System, State Health Insurance Group plans, and for purposes of the South Carolina Tort Claims Act. *Id.* MUHA must make pension payments to the South Carolina Retirement System on behalf of personnel or employees "who qualify in the same manner as other state employees in the executive branch of the government." *Id.* § 60(E)(7). MUHA must pay contributions to the Office of Insurance Services for health and dental plans for personnel employed by it "who qualify in the same manner as other state employees in the executive branch of the government." *Id.* § 60(E)(8).

MUHA must conduct an annual fiscal audit by a certified public accountant and report the findings "to the Governor and the General Assembly." *Id.* § 60(E)(10). After review of this audit, the legislature may, by joint resolution, or the Governor, by Executive Order, request audits be completed by the State Auditors Office or the Legislature Audit Council. *Id.* § 60(F). Further, based on the findings reported in the audits required by § 60(E)(10), the legislature, by joint resolution, may require "intervention by the State Fiscal Accountability Authority for the purposes of rectifying any material findings reflected in the audits." *Id.* MUHA must prepare and submit an annual budget to the General Assembly and the Governor for review. § 60(E)(11).

MUHA receives passthrough federal funding via the South Carolina Department of Health and Human Services ("DHHS").[3] MUHA also receives money from the State for various initiatives. In the 2022-2023 Appropriations Act (the "budget"), MUHA received nearly $31 million dollars. Per the budget, DHHS is required to contract with MUHA for $5,000,000.00 to develop "a statewide, open access South Carolina Telemedicine Network," H. 5150, Part IB, §117.116(B), 124th Gen. Assemb. (S.C. 2022) ("H. 5150"), "transfer [to MUHA] $1,000,000" for sickle cell disease treatment and awareness "within South Carolina," *id.*, and contract with MUHA "in the amount of $1,500,000 . . . to further develop statewide teaching partnerships," *id.* § 32.22(1). MUHA further received $10,000,00.00 for infrastructure related to the SC Children's

---

[3] Section 60(I) reads in pertinent part: "Beginning in fiscal year 2000-2001 state appropriations to the Medical University of South Carolina for support of the Medical University hospitals and clinics shall be redirected to the Department of Health and Human Services. These funds shall be used as match funds for the disproportionate share for the hospital's federal program. Any excess funding may be used for hospital base rate increases. Beginning in fiscal year 2000-2001 and in subsequent years, the Department of Health and Human Services shall pay to the Medical University of South Carolina Hospital Authority an amount equal to the amount appropriated for its disproportionate share to the Department of Health and Human Services. This payment shall be in addition to any other funds that are available to the authority from the Medicaid program inclusive of the disproportionate share for the hospital's federal program."

11

Hospital Collaborative and $750,000.00 for traumatic brain injury research. *Id.* § 118.19. The State also appropriated $14,225,000.00 to MUHA for telemedicine and included this money under its calculations for *MUSC's* "Total Funds" in the budget. *Id.* § 23.

With § 60 in mind, the Court notes the symbiotic relationship between MUSC and MUHA. While MUSC and MUHA are distinct legal entities, they exist—practically speaking—as a single unit, sharing overlapping functions and the mission of providing health care to South Carolina citizens and educating future health care professionals. *E.g.*, § 60(A)(2) (board of trustees of MUSC has power to confer degrees in medicine, dental medicine, pharmacy, nursing, health-related professions, and graduate studies in related health fields"); § 60(B) (requiring all revenues of MUSC, the Medical University Hospital, and any funds transferred to MUSC from a practice plan to be expended "for a public purpose"); § 60(E) designating MUSC's board of trustees as "MUHA" while operating the hospital); § 60(H) ("The authority shall offer and provide to [MUSC] the services necessary for the training and education of health professionals."); § 60(I) ("The authority shall continue to operate the hospital as a health provider for the citizens of South Carolina *and* the clinical site for the education and training programs of [MUSC].") (emphasis added). The Court strains to imagine a scenario whereby MUSC could function without MUHA.

The close relationship between MUSC and MUHA is exemplified by Plaintiff's own allegations. Plaintiff alleges it contracted with MUHA to provide radiation therapy services, equipment, space, personnel, and supplies at the hospital in exchange for a percentage of all amounts collected by MUHA from patients to whom services are provided. (Dkt No. 1 at 1, 25). At oral argument, Plaintiff confirmed its services were delivered under the supervision of physicians who were employed by MUSC. Plaintiff did not dispute that these physicians were paid by MUSC. *See* H. 5150, § 23. Thus, while Plaintiff's contract is with MUHA, Plaintiff only

12

earns money thereunder because of doctors MUSC employees—employees who work, for that matter, in facilities operated by MUHA.

### i.     State Treasury

Although the focus of the first factor is whether the "primary *legal* liability" for a judgment will fall on the state, *Regents of the Univ. of Cal.* 519 U.S. at 428 (emphasis added), the practical effect on the state treasury of a judgment against the entity must also be considered. "Where an agency is so structured that, as a practical matter, if the agency is to survive, a judgment must expend itself against state treasuries," *Hess v. Port Auth. Trans–Hudson Corp.,* 513 U.S. 30, 50 (1994) (alteration omitted), the agency will be found to be an arm of the state, *see United States ex rel. Oberg v. Pa. Higher Educ. Assistance Agency,* 745 F.3d 131, 137 (4th Cir. 2014); *Cash,* 242 at 223.

"[I]f the State treasury will be called upon to pay a judgment against a governmental entity, the [entity is an arm of its creating state], and consideration of any other factor becomes unnecessary." *Cash,* 242 F.3d at 223. If the state treasury will not be liable for a judgment rendered against the entity, the Court must consider the remaining factors, which focus on the nature of the relationship between the state and the entity it created. *See id.* at 224; *accord Lee–Thomas v. Prince George's Cty. Pub. Sch.,* 666 F.3d 244, 248 n. 5 (4th Cir.2012).

Section 60(3)(c) states that "[a]ny guarantee or indebtedness of the authority shall not create an obligation of the State, nor shall any such guarantee or indebtedness be considered a debt against the general revenue of the state." By statute, the State is not legally liable for MUHA's debts. The Court must still analyze, however, whether the State is practically liable for MUHA's debts. *Ristow v. South Carolina Ports Authority*, 58 F.3d 1051, 1053 (4th Cir. 1995).

The Court finds instructive *Ristow v. South Carolina Ports Authority*. In *Ristow*, the Fourth Circuit found that the South Carolina Ports Authority (the "Ports Authority") was an arm of the State. Though "nothing in the South Carolina statutes or case law impos[ed] liability per se on the state for judgment against its Ports Authority," 58 F.3d at 1053, the court found that the "practical effect of South Carolina's treatment of the fiscal affairs of the Ports Authority . . . definitely implicates the state treasury." *Id.* at 1054. This was because the State authorized bonds to support the Ports Authority, the principal and the interest of which was paid out of "South Carolina's general tax revenue" and the State had the legal right, and did in fact, withdraw over $1.5 million from the Ports Authority during its lifetime. *Id.* ("Obviously, the legislature will not be able to withdraw net revenues 'not necessary or desirable for operation' if the Ports Authority's operational funds have been depleted by judgments against it."). Important here, the Fourth Circuit also so held because, "to the extent that a judgment would deplete its resources, the Ports Authority would be unable to utilize earnings for necessary capital improvements, and so would continue to depend on the state treasury for these required expenditures. To deny Eleventh Amendment immunity in these circumstances would ignore economic reality." *Id*; *see Martin v. Clemson Univ.*, 654 F. Supp. 2d 410, 418 (D.S.C. 2009) (holding Clemson University to be an arm of the state and finding first *Ram Ditta* factor weighed in its favor despite university's insurance policy because "any part of a judgment not covered by the tort liability policy issued to Clemson by the Budget and Control Board would have to be paid by the state or Clemson from public funds, thereby negatively impacting the state treasury") (citing *Ristow*, 58 F.3d at 1054-55).

Here, practically speaking, if MUHA were compromised by a judgment against it, MUHA would not be able to operate the hospital, § 60(I) ("The authority shall continue to operate the hospital as a health care provider for the citizens of South Carolina . . . ."), or support MUSC, the

state's medical school, *Id.* ("The authority shall continue to operate the . . . clinic site for the education and training programs of the Medical University of South Carolina"). *Id.* §(H) ("The Authority shall offer and provide to [MUSC] the services necessary for the training and education of health professionals."). As noted above, the General Assembly allocated nearly $31 million dollars to MUHA in the 2022-2023 budget, negating any argument MUHA is entirely self-sufficient or that a judgment against MUHA would not have the potential to force the General Assembly to "set off [Plaintiff's recovery] . . . for the next fiscal year, resulting in [] direct [harm] to the state." *Ristow*, 407 F.3d at 264; *Clemson Univ.*, 654 F. Supp. 2d at 418. Plaintiff's argument to the contrary is myopic in scope and irrelevant to the question at hand. *See* (Dkt. No. 15 at 10) (arguing a judgment against MUHA would have no practical effect against the State because Plaintiff seeks money which, under the Contract, is derived from patients and third-party private and public health insurers MUHA bills). To the extent Plaintiff also argues a judgment against MUHA would not implicate the state treasury because its damages (roughly $2,300,00.00 "and counting") pale in comparison to MUHA's clinical services revenue, the inquiry misses the mark. A judgment against MUHA could still create a shortfall which "would have to be paid by the state or [MUHA] from public funds, thereby negatively impacting the state treasury," *Clemson Univ.*, 654 F. Supp. at 418, and which would, in turn, compromise the various State-funded initiatives financed by the General Assembly in the budget.

Accordingly, the Court finds factor one weighs in favor of finding MUHA is an alter ego of the State. Further, even if did not, such a finding would not be dispositive, *Cash,* 242 F.3d at 224; *Federal Maritime Com'n v. South Carolina State Ports Authority*, 535 U.S. 743, 769 (2002) (noting the "primary function of sovereign immunity is not to protect state treasuries, but to afford

the States the dignity and respect due sovereign entities"), and the Court would still proceed—as it does here—to analyze the remaining *Ram Ditta* factors, all of which weigh in MUHA's favor.

    ii.    **Autonomy**

The second *Ram Ditta* factor requires the Court to determine "the degree of autonomy exercised by the entity, including such circumstances as who appoints the entity's directors or officers, who funds the entity, and whether the State retains a veto over the entity's actions." *Oberg*, 804 F.3d at 668. "Also relevant to the autonomy inquiry is the determination whether an entity has the ability to contract, sue and be sued, and purchase and sell property, and whether it is represented in legal matters by the state attorney general." *Id.*

*Maryland Stadium Authority v. Ellerbe Becket Inc.*, 407 F.3d 255 (4th Cir. 2005) is instructive. There, the Fourth Circuit held that the University of Maryland (the "university") was the alter ego of the State of Maryland. The court first noted that, "[a]lmost universally" courts have held that universities are "arms of the state." *Id.* at 262-63 (string citing cases). After finding factor one weighed in the university's favor, the Court addressed factor two, "autonomy." *Id.* at 264-65. Despite finding that the university retained "some operational independence in its day to day activities," the Fourth Circuit found the university was "still [so] closely tied to the state" that the factor weighed in its favor. *Id.* The court noted that the university's board was appointed by "the Governor with the advice and consent of the Maryland Senate or are state officers," a "key indicator of state control." *Id.* at 264. The court then noted the "veto" power exercised by Maryland over "most of the University's actions." *Id.* (approval from legislature required for purchase and sale of real estate and contracts over $500,000; university subject to annual audit by the Legislative Auditor; university receives appropriations and requires a budget amendment to spend any excess revenue received; university income handled by State Treasurer; all university property deemed

16

that of Maryland). Further, while the university could issue bonds, it was permitted to do so "only after receiving legislative approval and it lacks the power to tax." *Id.* (noting the "absence of the power to tax is a strong indication that an entity is more like an arm of the state than a county or city").

The Court finds that the "autonomy" factor weighs strongly in favor of finding that MUHA is an alter ego of the State.  MUHA's Board of Trustees—which it shares with MUSC—is appointed by the General Assembly and Governor. § 59-123-40.  Further, at his or her discretion, the governor may remove members of the board or any officer of the MUHA or its affiliates found guilty of various types of misconduct. § 60(H).  Additionally, like the university in *Maryland Stadium Authority*, the State of South Carolina maintains a "veto" over many of MUHA's actions. While MUHA may purchase and dispose of real estate, such decisions are subject "to the authority and approval of the State Fiscal Accountability Authority or the Department of Administration" and all proceeds must be "used exclusively for the support of the Medical University." *Id.* § 60(E)(3)(b). The issuance of bonds likewise requires the approval "by resolution of the State Fiscal Accountability Authority" and MUHA lacks the ability to levy taxes, "a strong indication that an entity is more like an arm of the state than a county or city." *Id.* § 60(E)(3)(d); *Maryland Stadium Authority*, 407 F.3d at 264.  MUHA is also subject to audits by the legislature or Governor and the legislature, by joint resolution, "may require intervention by the State Fiscal Accountability Authority for the purposes of rectifying any material findings in the audits." *Id.* § 60(E)(10), (F).

A cursory reading of § 60—done only under *Ram Ditta*—could lead one to conclude that MUHA possesses substantial autonomy vis-à-vis the State. A closer reading of § 60, however, especially in light of later Fourth Circuit authority (*Ristow* and *Maryland Stadium Authority*),

ineluctably leads to a contrary conclusion. Under the binding authorities discussed above, factor two weighs heavily in favor of finding MUHA is an arm of the state.

### iii.    State Concerns

The third *Ram Ditta* factor requires the Court to consider "whether the entity is involved with state concerns as distinct from non-state concerns, including local concerns." *Oberg*, 804 F.3d at 674. "'Non-state concerns,' however, do not mean *only* 'local' concerns, but rather also encompass other non-state interests like out-of-state operations." *Id*.

The Court finds this factor weighs heavily in favor of finding MUHA is an alter ego of the State. As noted *supra*, MUHA operates the hospital, which includes "hospitals, clinics, and other health care and related facilities" throughout South Carolina. § 60(E); *Id.* § 60(E)(3)(5) (MUHA accorded authority to "construct, operate, and maintain the hospital and related premises, buildings and facilities, and infrastructure"). MUHA works directly with MUSC—the State's public medical school—to facilitate the "training and education of health professionals." *Id.* § 60(H); *see* § 60(E)(3)(b) (requiring all proceeds "derived from the disposition of any real property" be remitted to the "MUSC Board of Trustees to be used exclusively for the support of" MUSC). MUHA's dual purposes, to provide medical care throughout South Carolina as well as support MUSC, lead this Court to conclude MUHA's work is of "statewide concern." *Maryland Stadium Authority*, 407 F.3d at 265. MUHA does not, as Plaintiff inaccurately claims, only provide patient services but also supports MUSC's academic mission. As the Fourth Circuit held in *Maryland Stadium Authority*, "[h]igher education is an area of quintessential state concern and a traditional state governmental function. And the University's mission, providing higher education for Maryland's youth, is clearly an area of statewide concern.") *Id.* (internal citations omitted). Further, to the extent Plaintiff argues that MUHA's work is better characterized as "local" because

it only operates 9 of the 94 hospitals/medical centers in the State, that argument rings hollow for the myriad reasons cited above. *See* (Dkt. No. 15 at 19).

Under the binding authorities discussed above, factor three weighs heavily in favor of finding MUHA is an arm of the state.

### iv.     Treatment Under State Law

The final arm-of-state factor requires us to consider how the entity is treated under state law. "In addressing this factor, a court may consider both the relevant state statutes, regulations, and constitutional provisions which characterize the entity, and the holdings of state courts on the question." *Oberg*, 804 F.3d at 675.

The Court finds this factor weighs in favor of finding MUHA is an alter ego of the State. Section 60(E) designated MUHA "an agency of the State of South Carolina." Further, while MUHA is autonomous in many ways, the State has retained various "veto" powers, discussed at length above. Additionally, by statute MUHA directly supports MUSC—the State's public medical university—in providing "training and education [to] health professionals," *see* § 60(H), a significant fact because it brings MUHA into the realm of higher education. *See, e.g.*, § 60(J) (directing MUHA to adopt a written policy for the hospital for expenditure of public funds and permitting public funds to be used for "events which recognize academic and research excellence"); *Maryland Stadium Authority*, 407 F.3d at 262-63 (noting that "[a]lmost universally" courts have held that universities are "arms of the state."). Accordingly, the fourth *Ram Ditta* factor weighs in favor of finding MUHA is an arm of the State.

At bottom, MUHA and MUSC are treated under § 60 as symbiotic entities and are, in a sense, alter egos. Not even Plaintiff seriously disputes that MUSC is an arm of the State. *See, e.g.*, *Beryl Ming Yu You v. Tolley*, No. 2:13-cv-1683, 2014 WL 3881039-DCN, at *2 (D.S.C. Aug. 6,

2014) (finding defendant MUSC "is immune from suit in this court"), *aff'd*, 588 F. App'x 291 (4th Cir. 2014). MUHA is too.

The Court finds, under the relevant Supreme Court and Fourth Circuit case law, that MUHA is an arm of the state of South Carolina and, thus, that the Eleventh Amendment bars Plaintiff from maintaining this suit in federal court.

### IV.     Conclusion

For the reasons stated above, Defendant's motion to dismiss (Dkt. No. 13) is **GRANTED** and the Court dismisses Plaintiff's complaint without prejudice.

**AND IT IS SO ORDERED**.

s/ Richard M. Gergel
Richard M. Gergel
United States District Judge

March 6, 2023
Charleston, South Carolina